J-S36001-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.R.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 531 EDA 2018 |

Appeal from the Decree January 9, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0001021-2017,
CP-51-DP-0000261-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: T.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 532 EDA 2018 |

Appeal from the Decree January 9, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0001022-2017,
CP-51-DP-0000262-2016

BEFORE:  GANTMAN, P.J., DUBOW, J., and KUNSELMAN, J.

MEMORANDUM BY KUNSELMAN, J.:　　　　　**FILED SEPTEMBER 05, 2018**

In this consolidated matter, Appellant C.D. ("Mother") appeals the involuntary termination of her parental rights to two children, three-year-old S.D. and two-year-old T.D., pursuant to 23 Pa.C.S.A. §§ 2511(a)(1); (2); (5);

and (8) and § 2511(b) of the Adoption Act.[1]  Mother also appeals the trial court's decision to switch the goal of the dependency litigation from reunification to adoption.  Because the record is utterly devoid of necessary facts, we vacate the termination decrees and the orders changing the goals.

An overture of the entire case yields only these facts of record:

The Philadelphia Department of Human Services ("DHS") became involved with the family in July 2014.  The children were adjudicated dependent in February 2016, but they were not removed from their parents' care until May 2016.  **See** Notes of Testimony, 1/9/2018, ("N.T."), 13-15. DHS originally became aware of the family from reports of the parents' use of marijuana and Mother's occasional use of benzodiazepines.  **Id.**  The trial court adjudicated the children dependent because neither parent stopped using these substances.  **Id.**, at 16. And because of this fact, and this fact alone, DHS removed the children from their parents' care several months later.  **Id.**, at 17.  No other safety risks were identified.  The DHS caseworker testified that the children were bonded to their parents and that this bond was likely a beneficial and healthy one.  But her lay opinion was that the children, both toddlers, were too young to suffer irreparable harm if the parental bonds were severed.  **Id.**, at 44; 46-47.  In January 2018, the trial court terminated the parents' rights even though children were separated from each other and neither was in a pre-adoptive placement nor a kinship placement.

_____

[1] The trial court also terminated the parental rights of M.G. ("Father"), who does not appeal.

In our thorough review, we have discovered that the termination proceeding was rather suspect. The only witness DHS offered – indeed the only witness who testified – was the family's assigned DHS caseworker, who took over for the previous caseworker approximately five months prior to the termination hearing. The caseworker was unable to testify in any great detail. In fact, Father's counsel objected to the fact that the caseworker, during her direct examination, read from documents that were not admitted, nor proffered as evidence. *See id.,* at 18. However, the trial court assumed the role of assistant solicitor, rehabilitated the witness by laying a foundation, and then overruled counsel's hearsay objection.

> FATHER'S COUNSEL: The [caseworker] witness is reading from a document. Might I – or could the document please be identified?
>
> THE [CASEWORKER] WITNESS: It's from the Single Case Plan.
>
> THE COURT: Okay. So –
>
> FATHER'S COUNSEL: That's not one of the exhibits.
>
> THE COURT: Okay. It doesn't have to be. Do you – are you relying on that to refresh your memory as to the different events that happened during the life of this case?
>
> THE CASEWORKER: Yes.
>
> THE COURT: Okay. So you're a case manager and as case manager, are you responsible for keeping records as to this family and children?
>
> THE CASEWORKER: Yes.
>
> THE COURT: Okay. And so, if anything came up in terms of having to come to court, would that be reflected in your case record?

THE CASEWORKER: Yes.

THE COURT: Okay. If you got any paperwork from a clinician as to these children, would that be in your case record.

THE CASEWORKER: Yes.

THE COURT: Okay. And as a part of that, do you have summaries of events that happened as to this family as a part of your case record?

THE CASEWORKER: Yes.

THE COURT: And is that one of the documents you're relying on today to testify?

THE CASEWORKER: My Single Case Plan, yes.

THE COURT: And I will allow that to happen. Okay.

FATHER'S COUNSEL: Your Honor, I would like – I would object on the basis of hearsay that the document has to be admitted into evidence at this – to be –

THE COURT: Objection overruled.

FATHER'S COUNSEL: - and exception –

THE COURT: Let's move on.

***Id.***, at 18-20.

When Father's counsel made another hearsay objection, the court overruled, stating, quite amazingly: "*They* laid the business records foundation which the court has accepted." ***Id.***, at 27.[2] (Emphasis added).

_____

[2] While Mother does not raise her overruled objection on appeal, we note that this foundation was not properly laid, per Pennsylvania Rule of Evidence 803(6). We also note that our Supreme Court recently addressed the business exception rule in a termination hearing. ***See In re A.J.R.-H.***, ---A.3d ---, 2018 WL 3455417 (Pa. July 18, 2018). In that case, the High Court articulated its disapproval of the assistant solicitor's in-bulk introduction of exhibits prior

Some facts, revealed during the termination hearing, we cannot possibly evaluate because the trial court actually prevented the parents' counsel from cross-examining the DHS caseworker.

For instance, the caseworker initially testified on direct examination that Mother cooperated with the Community Umbrella Agency ("CUA"), which provided services to Mother to aid with reunification. *Id.*, at 20. As such, the caseworker testified that Mother was compliant with the Single Case Plan's objective requiring cooperation. *Id.* The caseworker then testified on direct examination that Mother only missed two visits with the children – though some were cancelled through no fault of Mother's because the service provider was short-staffed. *Id.*, at 21.

However, when the children's guardian *ad litem* ("GAL") examined the caseworker, the caseworker agreed that "there were periods of time where Mom missed half of the visits that were offered to her." *Id.*, at 35. The caseworker further agreed with the GAL's characterization of her testimony that Mother "has been consistent with visits [in the three months] *since the last court date*." *Id.* (Emphasis added).

When it was her turn to cross-examine the caseworker, Mother's counsel sought to pin down Mother's overall compliance with the Single Case Plan's visitation objective. Counsel asked whether Mother's visitation was consistent or inconsistent *prior to the last court date*. *Id.*, at 47-48. (Emphasis added).

_____

to calling any witnesses to testify. *A.J.R.-H.*, at *8. Instantly, Mother did not object to this procedure, and, of course, she does not raise it on appeal.

- 5 -

The trial court, again doing the work of the assistant solicitor, prevented cross-examination from proceeding.

> THE COURT: Hold it. Can I ask you (Mother's counsel) something? When [the GAL] asked questions, when we went beyond the last court date, she was saying that [Mother] was inconsistent and that [Mother] almost missed like half her visits at time (sic) during the life of the case, so, are you (Mother's counsel) speaking a specific period of time or --?
>
> MOTHER'S COUNSEL: Well, I – I know [the GAL] went back to the last court date. I believe there was time before then, so I'm trying to see –
>
> GAL: I went beyond.
>
> THE COURT: She went –
>
> MOTHER'S COUNSEL: how far it goes back.
>
> THE COURT: -- beyond that.
>
> GAL: I went beyond that and asked question (sic) regarding Mom and Dad's attendance and she answered that they were inconsistent. [3]
>
> THE COURT: So, I believe that that question has been answered. Next question.

*Id*., at 47-48.

---

[3] This was a misrepresentation, inadvertent we hope, of the question that the GAL actually asked the caseworker. The exact question was: "Would you (the caseworker) agree that there were periods of time where Mom missed half of the visits that were offered to her." The answer was in the affirmative.

There was no other testimony or documentation of how often Mother visited the children. Thus, Mother's counsel was prevented from establishing Mother's level of compliance with this reunification objective.

Elsewhere in the cross-examination, during the vital discussion about the parent-child bond, the court supplied yet another *sua sponte* "asked and answered" objection.[4] In this instance, the caseworker had opined that while the children appeared bonded to the parents, she later elaborated that severance of this bond would not cause the children irreparable harm. ***Id***., at 33. During cross-examination, Father's counsel challenged the caseworker's basis for this opinion:

> FATHER'S COUNSEL: What's your reason for – do you think that the children would be affected by not seeing their father in any way?
>
> THE CASEWORKER: No.
>
> FATHER'S COUNSEL: And what's your reason for that?
>
> THE CASEWORKER: Because of their age.
>
> FATHER'S COUNSEL: Do they have a bond with – a parent/child bond? Do either of the child – let's take the children one at a time. With respect to [S.D.], how old is [S.D.]?
>
> THE CASEWORKER: Three years old.
>
> FATHER'S COUNSEL: And how – do you think that [S.D.] would have – would be affected by not seeing his father any further?
>
> THE CASEWORKER: I'm not sure.

---

[4] Presumably based on Pa.R.E. 403.

FATHER'S COUNSEL: You think a three-year-old –

THE COURT: Did you (the caseworker) just answer the question?

FATHER'S COUNSEL: Yeah.

THE COURT: She said she didn't think there would be any irreparable harm because of their age. So what's your question now?

FATHER'S COUNSEL: Is it – is it your – is it your understanding that a three-year-old doesn't have the maturity to form a parental bond?

GAL: Objection

THE COURT: Okay. I – motion –

FATHER'S COUNSEL: All right (sic)

THE COURT: We're going to move to strike that.

*Id*., at 45.

When Mother's counsel then cross-examined the caseworker, she picked up on this line of questioning. After eliciting from the caseworker that the children also have a bond with their Mother, Mother's counsel then sought to impugn the caseworker's basis for determining that severance of *this* bond would not cause irreparable harm either. The dialogue revealed that the caseworker only ever saw the children with their parents once, for half of a visit, totaling 30 minutes:

MOTHER'S COUNSEL: But you (the caseworker) haven't had a chance to observe either child's interaction with Mother.

THE CASEWORKER: Not for a long enough period of time.

MOTHER'S COUNSEL: Not for a long enough period of time what?

THE CASEWORKER: Well, I've only observed for about a half an hour.

MOTHER'S COUNSEL: So, in that half hour, you made a decision that there would be no irreparable harm if the relationship is severed?

THE CASEWORKER: No.

MOTHER'S COUNSEL: So, then what did you base that decision on?

THE COURT: You're talking about outside of all the testimony she's already provided on direct and all the exhibits that came in uncontested? Is that what you're talking about, outside of that?

MOTHER'S COUNSEL: I'm asking why –

THE COURT: Because she didn't say that assessed it based on a 30-minute observation of Mom. You (Mother's counsel) said that, so I don't want to mischaracterize the record. She didn't say that was the only contact, but if you're talking about in 30 minutes, we can talk about that. I don't understand your question. Can you rephrase it?

MOTHER'S COUNSEL: Why do you believe that there will be no irreparable harm if Mom's rights - -

THE COURT: She – asked and answered.

MOTHER'S COUNSEL: I - -

THE COURT: She asked and answered that. She said because of their age. She said it twice.

MOTHER'S COUNSEL: I thought that was Father. That was Father, Your Honor.

THE COURT: It was asked about parents.

MOTHER'S COUNSEL: It was asked about Father. I really believe it was asked just about Father.

GAL: I think so.

THE CASEWORKER: Because of their age.

- 9 -

*Id*., at 49-50; *see also id.*, at 38.

Mother's counsel was correct. The assistant solicitor's question was about *whether* the children would suffer irreparable harm if the bonds as to both parents were severed. The caseworker answered in the negative. Father's counsel pursued the basis for this answer (the children's young age), but Father's counsel only asked as to the bond *with Father*. We could have inferred that the basis of the caseworker's opinion (the young age) was the same basis as to both parents; indeed the caseworker testified as much. But that was not the only purpose of the parents' respective cross-examinations.

Both of parents' cross-examination of the caseworker sought to press the witness on her understanding of childhood development and the inevitable consequences a bond severance will have on the children. In the absence of an expert opinion from, say, a forensic psychologist, the trial court was left to rely on only the lay opinion of the caseworker. We have said such a reliance is acceptable. *See, e.g., In re Adoption of J.N.M.*, 117 A.3d 937, 944 (Pa. Super. 2018). But the trial court actively stopped the cultivation of this opinion, and in doing so, prevented us from ascertaining the opinion's validity.

And yet there are still other facts contained in the record, which the trial court wholly refused to accept. The caseworker testified that Mother completed a number of reunification objectives under the Single Case Plan, including: compliance with CUA's services; completion of a parenting course; and completion of an anger management course. However, the court was under the mistaken impression that the caseworker testified to the contrary.

The caseworker sought to correct this mistake, even going so far as to interrupt the trial court during its delineation of reasons for termination. But the court refused to acknowledge the error. *Id.*, at 39; 68.

The dearth of any real evidence of record after three and a half years of dependency proceedings is absolutely stunning. In its Pa.R.A.P. 1925(a) opinion, however, the trial court detailed four entire single-spaced pages worth of facts that are *not* of record – not in the 70-page transcript of testimony, nor in the 19 exhibits submitted by DHS.[5] *See* T.C.O., at 1-4.

These facts do not seem to be fabricated from whole cloth; the trial court opinion's fact section is largely a carbon copy of "Exhibit A" attached to DHS' termination petition. Regardless of their origin, it is unclear whether these facts have ever been tested by the crucibles of the Pennsylvania Rules of Evidence.[6]

---

[5] The trial court could not have garnered these facts from the order adjudicating the children dependent – Exhibit 1 – because the order states that findings were made on the record. Similarly, none of the trial court opinion's facts were detailed in the other orders. *See* Exhibit 4: Continuance Order; Exhibit 5: Order for Protective Custody; Exhibit 6: Shelter Care Order; Exhibit 7: Master's Recommendation and Continuance Order; Exhibits 9, 10, 11: all Master's Recommendations and Permanency Review Orders; Exhibit 15: Status Review Order; Exhibit 16 – Permanency Review Order. Exhibits 2-3, 8, 10, 13-14, and 19, are mere drug screen reports. Exhibits 12, 17-18 are similarly devoid of facts.

[6] Some facts seem largely benign, *e.g.*, the reunification objectives outlined in the Single Case Plan. Other facts seem far more controlling *e.g.*: the circumstances of the children's births; and the safety concerns that brought the family to the attention of DHS. We cannot differentiate which facts were firmly established during the course of the dependency proceedings from those that might have existed merely as unfounded allegations.

We can say with certainty, however, that these facts were not established during the termination hearing. At the subject hearing, Father's counsel objected to the leading nature of the assistant solicitor's direct examination of the caseworker. N.T., at 14-15. The assistant solicitor sought to establish the history of the family's involvement with DHS prior to their involvement with the court. The court overruled the leading objection:

> THE COURT: I'm going to allow it. Your objection is overruled. Also, I take **judicial notice** that when I went through **the file**, when I first looked at the Court's record, I think we go back to – I have something dated around July 2014, naturally, when – when the initial petition indicates that the agency or DHS first got involved with the family, so –.

*Id.*, at 15. (Emphasis added).

We do not know whether the trial court meant that it took judicial notice only of that fact that DHS has been involved since 2014. We do not know whether the trial court relied on its own notes or documents from its internal file. We do not know whether the trial court means to suggest that the entire history is an uncontestable fact.

Because the trial court has terminated these children's rights and Mother appealed the termination decrees, the entire record from the dependency hearings is reviewable. *See In the Interest of N.M.*, 186 A.3d 998 (Pa. Super. May 4, 2018) (reargument denied). But if the trial court meant to take judicial notice of facts articulated in prior permanency review hearings, Pa.R.E. 201 ("Judicial Notice of Adjudicative Facts") is not a proper vehicle. *See*

Pa.R.E. 201(b);[7] *see also Kinley v. Bierly*, 876 A.2d 419 (Pa. Super. 2005) (Judicial notice allows the trial court to accept into evidence indisputable facts to avoid the formality of introducing evidence to prove an incontestable issue.).

With a firm understanding of what is known and what is unknown, we now address the merits of Mother's appeal.

Mother raises five issues for our review:

> 1. Whether the trial court erred when it found that [DHS] by clear and convincing evidence had met its burden to terminate [Mother's] parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1); (2); (5); and (8)?
>
> 2. Whether the trial court erred when it found that termination of Mother's parental rights was in the [children's] best interests and that [DHS] had met its burden pursuant to 23 Pa.C.S.A. § 2511(b)?
>
> 3. Whether the trial court erred when it found that the Department of Human Services by clear and convincing evidence had met its burden to change the [children's] goal[s] to adoption?
>
> 4. Whether the trial court erred in finding the termination of the parental rights would not cause irreparable harm to the children?
>
> 5. Whether the trial court erred in evaluating Mother's level of compliance and success with her goals?

Mother's Brief, at 2.

_____

[7] "Rule 201(b) Kinds of Facts That May Be Judicially Noticed. The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be question."

We begin by observing our standard of review regarding orders terminating parental rights:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, **or insufficient evidentiary support for the trial court's decision**, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re A.R.*, 125 A.3d 420, 422 (Pa. Super. 2015) (quoting *In re S.H.,* 879 A.2d 802, 805 (Pa.Super.2005)) (emphasis added).

As our Supreme Court has previously stated, appellate courts – unlike trial courts – are not in a position to make the close calls based on fact-specific determinations. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). Not only do trial judges observe the parties during the termination hearing, but they usually preside over the dependency hearings with the same parties and have a longitudinal understanding of the case and the best interests of the children involved. *Id.* Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment *so long as the factual findings are supported by the record* and the orphans' court's legal conclusions are not the

- 14 -

result of an error of law or an abuse of discretion. ***In re Adoption of S.P.***, 47 A.3d 817, 827 (Pa. 2012) (emphasis added).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking termination of parental rights are valid. ***In re R.N.J.,*** 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, as we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" ***Id.*** (quoting ***In re J.L.C.,*** 837 A.2d 1247, 1251 (Pa. Super. 2003)).

With the above standards in mind, we next direct our attention to Mother's first issue, namely, that DHS failed to establish evidentiary grounds for termination under 23 Pa.C.S.A. §§ 2511(a)(1); (2); (5); and (8) of the Adoption Act.[8] We agree.

---

[8] **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

The trial court's opinion is an expanse of improperly referenced details. One fact is uncontested, however. Mother has never passed any of her drug screens, which the court ordered early and often. Although we are not obligated to do so, Mother's asks us to consider a recent decision from Missouri's intermediate appellate court, where a parent's marijuana use did not warrant the termination of parental rights:

> It is not enough to simply say that [the parent] did not meet a goal of the service plan and did not adjust his circumstances to become and remain drug free without also making an explicit finding based on clear, cogent and

_____

[…]

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

[…]

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§2511(a)(1); (2); (5); (8).

convincing evidence that use of the drug was itself a potentially harmful condition.

*In re K.M.A.-B.*, 493 S.W.3d 457, 475 (Mo. Ct. App. 2016).

In the present case, we note that Mother's drug use was the *only* concern that caused the children's removal.

> THE ASSISTANT SOLICITOR: Why did [the children] have to be removed from the mother and father's case in May of 2016?
>
> THE CASEWORKER: The parents weren't being compliant with their objectives and they continued their drug use.
>
> …
>
> THE ASSISTANT SOLICITOR: Were there any other issues or concerns that prompted the removal from the parents' care?
>
> THE CASEWORKER: Not that I'm aware of.

N.T., at 16-17

Mother's marijuana and occasional benzodiazepine use – and her consequential defiance of court orders prohibiting this use - are essentially the only facts that support DHS' termination petition. But even the context of Mother's drug use is vague. There was no evidence of record of how often she used the drugs, nor whether the children were in an unsafe environment. There was no evidence that Mother's drug use resulted in criminal charges. There was no evidence that Mother could not perform her parental duties. There was no evidence that Mother's drug use caused the children to be without essential care, except when, of course, the court forbade their return to Mother's care until she presented a clean screen.

As we discussed above, testimony revealed Mother largely complied with all other reunification objectives even in the face of the trial court's questionable efforts to limit the scope of the caseworker's cross-examination. To be clear, the § 2511(a) analysis is not a scorecard; completion of a parenting class does not neutralize habitual use of a controlled substance.

But we also note that the trial court referenced, albeit improperly, that Mother alleged she suffered from a knee and foot injury and as well as anxiety and depression. *See* T.C.O., at 1-2. She also claimed that she had a prescription for the benzodiazepines. *Id.,* at 2. The trial court also noted, also improperly, that an explicit objective of Mother's Single Case Plan was the requirement that she see a primary care physician. *Id.*, at 3. We observe that benzodiazepines, and now certain forms of marijuana, can be either valid medical prescriptions or they can be illegally obtained and abused. We refrain from continuing this inquiry into facts not properly before us, but we mention them only to demonstrate how the deficiency of the record has obscured our review of Mother's drug use.

In our decision, we do not condone Mother's illicit drug use, nor do we adopt Missouri's precedent. Instead, our decision is compelled by the frustratingly little evidence of record in this case. All we can discern is that DHS, and then the court, told Mother to stop using marijuana. When she did not, Mother's children were removed, and her rights were terminated. Surely her case must be far more nuanced than this. But the record reveals nothing else.

As our Supreme Court has previously commanded, as we have dutifully noted above: we are "not in a position to make close calls," rather we "must resist the urge to second-guess the trial court" and impose our own judgment. *See R.J.T.,* 9 A.3d at 1190; *see also S.P.*, 47 A.3d, at 827. This is a sobering reminder of our role. But we cannot, and will not, affirm the termination of a parent's sacred, constitutionally protected rights based on the conjecture of facts not of record. Our conclusion here is an evidentiary one, not a comment about societal attitudes toward marijuana. DHS simply did not prove its case. Therefore, we find Mother's first appellate issue warrants a reversal.

Even if the grounds under § 2511(a) had been established, we would still vacate the termination decrees because Mother most definitely succeeds on her second contention. *See* Mother's Brief, at 2. The evidence of record does not support the conclusion that termination would serve the children's needs and welfare, per the second prong of the termination analysis under § 2511(b).

Termination of parent rights requires a bifurcated analysis. Initially, the focus is on the conduct of the parent. If the court determines that the parent's conduct warrants termination under § 2511(a), only then does the court engage in the second part of the analysis pursuant to § 2511(b):

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and **emotional needs and welfare** of the child. […].

23 Pa.C.S.A. §2511(b) (emphasis added); *see also In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017).

> Before granting a petition to terminate under § 2511(b) a court must:
>
> > [C]arefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the children's needs and welfare, **must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.**

*In re Adoption of G.L.L.* 124 A.3d 344, 347 (Pa. Super. 2015) (quoting *In re K.J.,* 936 A.2d 1128, 1134 (Pa. Super. 2007)) (emphasis original).

Instantly, we note that neither the assistant solicitor nor the GAL presented evidence or elicited testimony concerning the status of the bond. Cross-examination of the caseworker revealed that she only observed the children with their parents for one half of one visit, totaling 30 minutes. N.T., at 38. But even with this limited observation, the caseworker testified that the parents were appropriate, that the children were bonded to the parents. *Id.*, at 38; 46-47. The caseworker testified that Father appeared to be a positive influence on the children and the bond appeared healthy. *Id.* We can infer that the caseworker would have also opined, had the trial court not interfered with Mother's cross-examination, that the children's bond with their Mother was similarly healthy and beneficial. She further admitted that the

children were separated from each other and that neither child was placed in a kinship placement, nor a pre-adoptive foster home. Yet, the caseworker testified that the children would not suffer irreparable harm if these bonds were severed. *Id.*, at 33.

We note two deeper considerations in this portion of the analysis. First, the detrimental effects of severing a parent-child bond could be outweighed by the need for safety and security. *In re Adoption of J.N.M.*, 177 A.3d 937, 946 (Pa. Super. 2018) (citing *In re M.M.*, 106 A.3d 114, 119 (Pa. Super. 2014)). Second, the termination of parental rights statute does not require children to be placed in a pre-adoptive home as a precondition to the termination of parental rights. *In re K.C.F.*, 928 A.2d 1046 (Pa. Super. 2007).

However, when examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a "necessary and beneficial relationship," thereby causing a child to suffer "extreme emotional consequences." *J.N.M.* (citing *In re E.M.*, 620 A.2d 481, 484-485 (Pa. 1993)). Attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. *Id*. (citing *T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)).

In concluding that termination satisfied the second prong of the analysis the trial court reasoned, in its entirety:

In the instant matter, the social worker testified Mother missed most of her supervised visits with S.D. and T.D. [] [and] testified there would be no irreparable harm to S.D. and T.D. if Mother's rights were terminated. [] The social worker testified S.D.['s] and T.D.'s age[s] of three and two years would prevent irreparable harm if relationship (sic) with Mother was severed. [] Furthermore, the social worker testified the goal of Adoption (sic) for S.D. and T.D. would offer the most stability in the future for the children. []

[…]

Mother demonstrated through in her actions (sic) that she was not interested in reunifying with T.D. and S.D. [] The court found Mother's failure to maintain sobriety prevented a safe environment and Mother's reunification with T.D. and S.D. [] The court referenced Mother's recent attempt at compliance with her objectives for reunification were not significant to meet S.D. and T.D.'s day-to-day needs. []

T.C.O., at 7. (Citations to the transcript omitted).

We address the trial court's reasoning line by line.

The trial court begins by mischaracterizing the record. The caseworker did not testify that Mother missed most of her visits. Rather, she testified that there were periods where she missed half; the trial court then prevented further cross-examination as to the specifics of this period. *Id.*, at 35.

Next, although the caseworker did testify that the children would not suffer irreparable harm, she also testified that, not only was there a bond with Mother, but this bond was likely at least as beneficial and healthy as the one their shared with Father. *Id.,* at 44; 46-47. Moreover, the caseworker came to this conclusion after observing the children with their parents for one half of one visit.

Although we have noted that a direct observation of the parent-child interaction is not necessary in cases where the effects could be detrimental, we have similarly noted that it is wise to conduct a bonding evaluation when there is evidence of a bond. *J.N.M.*, 177 A.3d, at 944-945 (citing *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008)). Here, we can comfortably conclude that caseworker's opinion that the children are too young to suffer consequences does not equate clear and convincing evidence in light of her same testimony revealed that that children exhibited a bond – and likely a healthy bond – with Mother.

Third, we cannot agree with the trial court that termination will provide the most stability for the children. At the time of the termination hearing, the children were not placed together and they were not placed in a pre-adoptive foster home. While they had been in a kinship placement for an undeterminable amount of time, that placement had ceased to be an option at some point between the penultimate permanency review hearing and the termination hearing. At the time of the termination, the children were apart from Mother, apart from each other and in a brand new, non-kinship environment. "Thus, termination would cut off a natural and beneficial parent-child bond and would not facilitate putting another in its place. Termination would stabilize nothing." *See In re P.A.B.*, 570 A.2d 522 (Pa. Super. 1990). Pre-adoptive placement is not a precondition, but we cannot share the trial court's opinion that making orphans out of these children and putting them in

new, temporary homes would provide them the most stability. From the scant evidence of record, the exact opposite appears true.

We similarly disagree with the trial court's summation that Mother's actions demonstrated that she was not interested in reunification. The trial court ignored evidence that Mother cooperated with the CUA service provider and that she complied with the parenting and anger management objectives. The trial court actively limited cross-examination testimony that Mother complied with the visitation objective.

Even when peeking into the facts not in evidence, we do not share the trial court's conclusion that Mother placed the children in an unsafe environment. Indeed, much of trial court's recitation cites facts that likely have no place in the analysis. Section 2511(b) provides: "The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." 23 Pa.C.S.A. § 2511(b). The trial court noted that Mother did not have a refrigerator, that she did not obtain pre-natal care, that she had limited food in the home, that the home was dirty. T.C.O., at 2. Some of these improperly-referenced allegations the trial court included in its 1925(a) opinion are quite concerning, but it is questionable whether these facts constitute a suitable basis for termination.

In sum, we conclude that DHS' evidence is similarly insufficient as to the second prong of the termination analysis. Testimony that the children are too young to suffer irreparable harm does not constitute clear and convincing

evidence when the children are bonded to Mother. There was no evidence that this bond was unhealthy or detrimental. To the contrary, we can reasonably infer that the bond was healthy and beneficial.

Because our decision vacating the termination decrees will likely cause further dependency proceedings, we must address Mother's contention that the court erred in granting DHS' request to change the placement goal from reunification to adoption. ***See*** Mother's Brief, at 2.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court **if they are supported by the record**, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

***In re J.D.H.***, 171 A.3d 903 (Pa. Super. 2017) (quoting ***In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010)) (emphasis added).

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, inter *alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*Id.* (quoting *In re A.B.*, 19 A.3d 1084, 1088–89 (Pa. Super. 2011)).

As we noted in extensive detail above, the overwhelming lack of evidence constrains us to find the court abused its discretion on this issue as well. Evidence suggests that Mother has been largely compliant with Single Case Plan reunification objectives, but for the obvious drug screen objective. No evidence of record exists regarding the appropriateness and feasibility of the new, current placement. In fact, the caseworker merely testified that she will look into another, potentially pre-adoptive placement sometime in the future. N.T., at 32-33. Additionally, there was no evidence about the children's safety. Testimony only revealed that the children have been removed from Mother's care for the preceding 20 months. Given the facts of record and those facts that are not, we must find that the goal change from reunification to adoption was similarly an abuse of discretion.

In short, we do not know what happened in this case. The caseworker, a latecomer to this matter – seemed woefully underprepared for the hearing. The factfinder, for reasons we cannot deduce, seemed bent on limiting the supply of the facts. The facts, sparsely mentioned during the testimony, were downright missing from the permanency review orders and other exhibits.

Generally, a termination hearing risks being treated as the inevitable conclusion of dependency proceedings – as a mere formality where the necessary players, who usually have been involved from the litigation's onset, operate under a shared knowledge of the relevant facts. Perhaps because of this familiarity, witnesses are not prepped, facts are not elicited, and judges

are too quick to admonish perceived repetition. But a termination hearing is a snapshot in time, a notion demonstrated when the presiding juvenile court judge exchanges her dependency court robe for an orphans' court one. Without a detailed record documenting the history of the case, and without supporting testimony and evidence at the termination hearing, the appellate courts have no way of knowing what has transpired.

We remind the trial court of the importance of documenting factual findings and directions to parents in its orders throughout the litigation:

> The court order is the document that drives the case. If well-written and timely entered, the order gives clear and comprehensible direction to all parties what the court expects. It enables the caseworker to initiate the necessary services and fine-tune the Family Service Plan. A good court order should state the court's findings of fact…detailed findings can save time later as they may be incorporated at the permanency hearing to consider a change of goal or at a TPR hearing. In cases of multiple siblings, the findings, conclusions, and orders should be child-specific. The order should clearly communicate to the parties, foster parents, providers, and other interested persons what is expected between the review hearings. Whenever feasible, detailed court orders should also contain dates or timelines for implementation of specific orders. This can increase accountability and encourage timely case progress.

Pennsylvania Dependency Benchbook, Rev. 2014, at § 12.8.

Together with the termination of a person's liberty, "the termination of parental rights is one of the most serious and severe steps a court can take." *See In re Bowman*, 647 A.2d 217 (Pa. Super. 1994) (reargument denied) (citation omitted). As established by the Supreme Court of the United States, termination of parental rights is such a grave interference into the realm of

the family that a determination to terminate parental rights must be supported by clear and convincing evidence – the highest level of proof required in any civil proceeding. ***See generally Santosky v. Kramer***, 455 U.S. 745 (1982); ***see also In re B.L.L.***, 787 A.2d 1007, 1014 (Pa. Super. 2001). At the same time, children can suffer lifelong injuries as side effects of the bureaucracy orchestrated to ensure their safety and security. ***See, e.g., T.S.M.***, ***infra***, 71 A.3d at 252 (Pa. 2013). Here, the instruments of the system broke down.

The courts' caseload and counties' finite resources are not lost on us. We appreciate that the caseload in Philadelphia is greater than other counties. But the "clear and convincing" evidentiary standard creates a baseline for what the law demands. For this family, the powers that be have not met this baseline. Meanwhile, these children – three and half years after blipping onto DHS' radar and two years after starting court proceedings – are nowhere closer to achieving the security and stability to which they are entitled.

Under the facts as they have been preserved in this record, we conclude that the trial court abused its discretion in terminating Mother's parental rights and changing the respective goals from reunification to adoption.

Decrees vacated. Goal-change orders reversed. Jurisdiction relinquished.

President Judge Gantman joins.

Judge Dubow did not participate in the consideration or decision of this matter.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/5/18